# STATE OF CONNECTICUT *v.* PATRICK SMITH
## (AC 27837)

Flynn, C. J., and Robinson and Pellegrino, Js.

Argued February 11—officially released May 13, 2008

*James B. Streeto*, assistant public defender, for the appellant (defendant).

*Robin S. Schwartz*, assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *Robin Lipsky*, former senior assistant state's attorney, for the appellee (state).

*Opinion*

PELLEGRINO, J. The defendant, Patrick Smith, appeals from the judgment of conviction, rendered after a jury trial, of robbery in the first degree in violation of General Statutes § 53a-134 (a) (3), kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (B), and sexual assault in the third degree in violation of General Statutes § 53a-72a (a) (1). On appeal, the defendant claims that (1) the trial court improperly

denied his motion to suppress the pretrial and trial eyewitness identifications made by the victim, (2) the court improperly admitted into evidence a chisel found in the victim's automobile, (3) the prosecutor engaged in impropriety and (4) the court improperly gave a Chip Smith instruction to the jury. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the evening of January 17, 2002, the victim[1] stopped at a D.B. Mart in Waterbury to buy some groceries. The victim was seated, loading purchases into her car when she looked up and saw the defendant standing just outside her open driver's side door, wearing a lady's stocking over his head and holding a knife-like object. The defendant told the victim to move over and give him the keys to the car, which the victim did. The defendant entered the victim's car and grabbed her by the hair. He held her against the passenger side door and said that he would hurt her unless she cooperated. The defendant then drove away from the D.B. Mart parking lot.

At one point, the defendant stopped the car and demanded the victim's purse. He removed from it her money, credit card and driver's license. He then drove along a nonresidential road in an industrial park, finally parking the car near a dumpster behind an unlit building. At this point, the defendant pulled down his pants, exposed his penis and told the victim "to treat him like he was [her] boyfriend or lover." As the victim touched the defendant's penis, he put his hands down her pants and touched her vagina. After approximately fifteen minutes of this behavior, the defendant got out of the car, walked around to the car's passenger side, pushed

---

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

the victim into the driver's seat and ordered her to drive to a certain automated teller machine, which she did, and then ordered her to use her credit card to make a cash withdrawal. The victim attempted to make the withdrawal but was unsuccessful because she did not know her personal identification number. The defendant then ordered the victim to continue driving, and, as she approached the parking lot where he had first entered her vehicle, he ordered her to stop the car. He then exited the car, disappearing into the night and ending the encounter.

The victim thereafter drove toward her house. She used her cellular telephone to call her fiance and told him that she had been robbed. He called the police and, shortly after the victim returned home, officers from the Waterbury police department arrived at her house. The victim provided Angel Robles, a Waterbury police detective, with a description of her assailant and accompanied the police officers to the police station to give a formal statement. Her car was impounded as evidence. The police returned the victim's car to her a few days later. One week later, she found a chisel under the driver's seat as she cleaned the car. The chisel did not belong to her or her fiance, and she notified the Waterbury police department and turned it over to the police.

On January 29, 2002, members of the Waterbury police department contacted the victim. They informed her that they may have caught the person who had assaulted her and asked her to come to the police station to look at some photographs. The victim went to the police station and was given a photographic array from which she identified the defendant as her assailant.

The defendant thereafter was arrested and, by substitute information, charged with robbery in the first

degree, kidnapping in the first degree and sexual assault in the third degree. The jury found the defendant guilty on all counts. The court sentenced the defendant to a term of imprisonment of eighteen years on the charge of robbery in the first degree, twenty-one years on the charge of kidnapping in the first degree and five years on the charge of sexual assault in the third degree. The court imposed a total effective sentence of twenty-one years imprisonment. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court improperly denied his motion to suppress the pretrial and trial eyewitness identifications made by the victim because the identifications were the product of an unnecessarily suggestive identification procedure in violation of the fifth and fourteenth amendments to the United States constitution.[2] Specifically, the defendant argues that the pretrial photographic array presented to the victim was unnecessarily suggestive because (1) the identification procedure was not a double-blind sequential procedure,[3] (2) the officers never warned the victim that the

---

[2] The defendant further claims that the identifications violated his rights under article first, § 8, of the constitution of Connecticut. The defendant, however, has failed to provide an analysis of his claim under the constitution of Connecticut independent of his claim under the analogous provisions of the United States constitution. "[W]e will not entertain a state constitutional claim unless the defendant has provided an independent analysis under the particular provisions of the state constitution at issue. . . . Without a separately briefed and analyzed state constitutional claim, we deem abandoned the defendant's claim . . . ." (Internal quotation marks omitted.) *State* v. *Fauntleroy*, 101 Conn. App. 144, 159 n.5, 921 A.2d 622 (2007). Accordingly, we confine our analysis to the defendant's federal constitutional claim. See *State* v. *Eady*, 249 Conn. 431, 435 n.6, 733 A.2d 112, cert. denied, 528 U.S. 1030, 120 S. Ct. 551, 145 L. Ed. 2d 428 (1999).

[3] "A double-blind photographic identification procedure is one in which the officer conducting [the procedure] has not been involved in the investigation and does not know who the target is. . . . A sequential photographic identification procedure involve[s] showing the witness the suspect and other fillers on the identification procedure one at a time, rather than the traditional practice of simultaneous presentation." (Citation omitted; inter-

suspect may not have been included in the photographic array through which the victim identified the defendant, (3) after the victim identified the defendant as her assailant, the officers told her that he was the suspect they were investigating, and (4) the color of the defendant's skin is comparatively lighter than that of the other seven suspects in the array, and he was the only suspect with long gray hair and blue eyes, wearing a red shirt. We disagree with the defendant's argument that the procedure was unnecessarily suggestive.[4]

The following additional facts are relevant to our resolution of the defendant's claim. On the evening of her assault, the victim provided the police with a description of her assailant. That same evening, the police conducted two separate show-up identification procedures with the victim.[5] In both instances, the victim indicated that the suspect was not her assailant.

Twelve days later, members of the Waterbury police department informed the victim that they had apprehended someone who they thought might be her assailant. She was asked to come to the police station to view

nal quotation marks omitted.) *State* v. *Nunez*, 93 Conn. App. 818, 825 n.3, 890 A.2d 636, cert. denied, 278 Conn. 914, 899 A.2d 621, cert. denied, 549 U.S. 906, 127 S. Ct. 236, 166 L. Ed. 2d 186 (2006).

[4] The defendant further argues that the identification procedure was unreliable because the victim did not know him, the victim's assailant wore a stocking mask that obscured his features, the victim's observation of her assailant occurred in a dark car at night with intermittent lighting from oncoming headlights and streetlights, the victim had a reduced level of perception during the assault due to her heightened emotional state, and there was a twelve day period between her assault and her identification of him as her assailant. Because we conclude that the court did not abuse its discretion in determining that the identification procedure was not unnecessarily suggestive, we need not determine whether the identification nevertheless was reliable. See *State* v. *Miller*, 202 Conn. 463, 470, 522 A.2d 249 (1987).

[5] "A show-up is the presentation of a single suspect to an eyewitness for possible identification." (Internal quotation marks omitted.) *State* v. *Ledbetter*, 275 Conn. 534, 549 n.12, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

a photographic array prepared by Detective Robles. Howard Jones, a Waterbury police detective, conducted the identification procedure. He set the array before the victim and told her to review it. He then stepped back and said nothing else. From this array, the victim identified the defendant as her assailant. She circled his photograph in black ink, initialed the photograph and signed a form confirming her identification. After this, Detective Jones advised the victim that she had identified the person the police were holding as a suspect.

At trial, the defendant filed a motion to suppress the victim's identification of him. The court orally denied the defendant's motion on October 25, 2005, finding that the array was comprised of photographs of eight individuals who all strongly resembled one another in terms of appearance and that the defendant's photograph did not stand out in the array. Accordingly, the court concluded that the identification procedure was not unnecessarily suggestive. The court also concluded that the even if the identification procedure had been unnecessarily suggestive, the totality of the circumstances required a conclusion that the victim's identification nevertheless was reliable.

We now set forth the applicable standard of review as stated by our Supreme Court. "[T]he required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. . . . To prevail on his claim, the defendant has the burden of showing that the trial court's determinations of suggestiveness and reliability both were incorrect. . . .

"Furthermore, [w]e will reverse the trial court's ruling [on evidence] only where there is an abuse of discretion or where an injustice has occurred . . . and we will indulge in every reasonable presumption in favor of the trial court's ruling. . . . Because the inquiry into whether evidence of pretrial identification should be suppressed contemplates a series of factbound determinations, which a trial court is far better equipped than this court to make, we will not disturb the findings of the trial court as to subordinate facts unless the record reveals clear and manifest error." (Internal quotation marks omitted.) *State* v. *Randolph*, 284 Conn. 328, 384–85, 933 A.2d 1158 (2007).

"Because, [g]enerally, [t]he exclusion of evidence from the jury is . . . a drastic sanction, one that is limited to identification testimony which is manifestly suspect . . . [a]n identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification." (Internal quotation marks omitted.) Id., 385. "Absent a very substantial likelihood of irreparable misidentification, [w]e are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." (Internal quotation marks omitted.) *State* v. *Cook*, 262 Conn. 825, 837, 817 A.2d 670 (2003).

"To determine whether a photographic array is unnecessarily suggestive, a reviewing court considers various factors, including, but not limited to: (1) the degree of likeness shared by the individuals pictured . . . (2) the number of photographs included in the array . . . (3) whether the suspect's photograph prominently was displayed or otherwise was highlighted in

an impermissible manner . . . (4) whether the eyewitness had been told that the array includes a photograph of a known suspect . . . (5) whether the eyewitness had been presented with multiple arrays in which the photograph of one suspect recurred repeatedly . . . and (6) whether a second eyewitness was present during the presentation of the array." (Citations omitted; internal quotation marks omitted.) *State* v. *Randolph,* supra, 284 Conn. 385–86.

On the basis of its factual findings, the court properly concluded that the photographic array from which the victim identified the defendant did not create a very substantial likelihood of irreparable misidentification. The police officers' use of an eight person photographic array is not, in and of itself, impermissibly suggestive. *State* v. *Sparks,* 39 Conn. App. 502, 511, 664 A.2d 1185 (1995) ("[t]he presentation of an array of several photographs to witnesses, including that of the suspect, does not constitute an impermissibly suggestive pretrial identification procedure in the absence of any unfairness or other impropriety in the conduct of the exhibit" [internal quotation marks omitted]). Furthermore, our thorough review of the record does not reveal any unfairness in the manner in which the array was presented to the victim. Accordingly, we reject the defendant's argument that the photographic array was unnecessarily suggestive.

The defendant's other arguments likewise fail. Due process does not require the suppression of a photographic identification that is not the product of a double-blind, sequential procedure. *State* v. *Nunez,* 93 Conn. App. 818, 828–32, 890 A.2d 636, cert. denied, 278 Conn. 914, 899 A.2d 621, cert. denied, 549 U.S. 906, 127 S. Ct. 236, 166 L. Ed. 2d 186 (2006). Further, the defendant's photograph used in the array was not unnecessarily suggestive. "The question . . . is not whether the defendant's photograph could be distinguished from the

other photographs, but whether the distinction made it unnecessarily suggestive." Id., 828; see also id., 827 (no constitutional mandate gives defendant right to photographic array of look-alikes); *United States* v. *Thai*, 29 F.3d 785, 808 (2d Cir.) (principal question is whether photograph of accused, matching descriptions given by witness, so stood out from all other photographs as to suggest to identifying witness that accused more likely to be culprit), cert. denied sub nom. *Lan Ngoc Tran* v. *United States*, 513 U.S. 977, 115 S. Ct. 456, 130 L. Ed. 2d 364, cert. denied sub nom. *Minh Do* v. *United States*, 513 U.S. 993, 115 S. Ct. 496, 130 L. Ed. 2d 406 (1994). This court cannot say that it was clearly erroneous for the trial court to find that the photographs included in the array all matched the description of the victim's attacker and that the defendant's photograph did not stand out from all the other photographs in such a manner as to influence the victim's identification.

Likewise, the failure of the police to provide the victim with a warning that the suspect may not appear in the photographic array does not render the identification unnecessarily suggestive. See *State* v. *Williams*, 203 Conn. 159, 177, 523 A.2d 1284 (1987) ("[w]hen . . . the victim would have inferred [without police comment] that the occasion for [her] being requested to identify someone is that the police have a particular person in mind who has been included among those to be viewed, police statements to that effect do not render the identification procedure unnecessarily suggestive" [internal quotation marks omitted]); *State* v. *Nieves*, 106 Conn. App. 40, 49–50, 941 A.2d 358, cert. denied, 286 Conn. 922, 949 A.2d 482 (2008). Finally, the police officer's telling the victim that she had identified the suspect *after* she positively identified the defendant as her assailant does not render the identification procedure unnecessarily suggestive. We reject the defendant's arguments that an identification procedure can be rendered unnecessarily suggestive by events that occur

after the positive identification actually is made. Accordingly, the court did not abuse its discretion when it concluded that the identification procedure used with the victim was not unnecessarily suggestive.

In order to prevail on his claim that the victim's identification was inadmissible at trial, the defendant must demonstrate both that the identification procedure was unnecessarily suggestive and that the resulting identification was not reliable under the totality of the circumstances. "Only if the procedures used to identify the accused are unnecessarily suggestive are we required to analyze the factors that determine the reliability of an identification for due process purposes." *State* v. *Miller*, 202 Conn. 463, 470, 522 A.2d 249 (1987). Because we conclude that the identification procedure used with the victim was not unnecessarily suggestive, we do not reach the question of the reliability of the resulting identification. See *State* v. *Holliman*, 214 Conn. 38, 49, 570 A.2d 680 (1990). The court properly denied the defendant's motion to suppress the victim's identification of the defendant.

## II

The defendant next claims that the court improperly admitted into evidence a chisel found in the victim's car. Specifically, the defendant contends that the state failed to make a preliminary showing of the chisel's relevance and chain of custody. We disagree.

The following additional facts are relevant to the defendant's claim. At trial, the victim indicated that the chisel the prosecutor showed her looked to be the same as the one she found in her car except for some sort of oxidation and "pink stuff" on it. The state then sought to establish the chisel's chain of custody through the testimony of police Sergeant Joseph Rainone. Rainone testified that in assisting a detective with this case, he received the chisel as evidence and subsequently heat

sealed it in an evidence bag. Rainone then indicated that the label on the evidence bag contained a clerical error. The case name on the label did not match the case number. Rather than containing the victim's name, the evidence label contained the name of a third party not involved in this case. Rainone testified that the case number associated with the evidence was correct but that the correct name should be that of the victim. He further testified that at some point, a second label was placed on the bag, which correctly listed the victim's name.

The court thereafter found that the chisel was relevant and that the chain of custody had been demonstrated sufficiently. The court found that the victim identified the chisel as the same one she removed from her car and that the chain of custody had been established with reasonable certainty to eliminate the likelihood of a mistake or alteration. Furthermore, the court found that the label placed on the evidence bag did not affect the chisel's admissibility. The chisel thereafter was admitted into evidence.

We now set forth our standard of review. "The standard of review we apply to a trial court's evidentiary rulings is well settled. Such rulings are entitled to great deference. . . . The trial court is given broad latitude in ruling on the admissibility of evidence, and we will not disturb such a ruling unless it is shown that the ruling amounted to an abuse of discretion. . . . Even when a trial court's evidentiary ruling is deemed to be improper, we must determine whether that ruling was so harmful as to require a new trial. . . . In other words, an evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful. . . . In our review, we make every reasonable presumption in favor of upholding the trial court's ruling." (Citation omitted; internal quotation marks omitted.) *State* v.

*Miller*, 95 Conn. App. 362, 387, 896 A.2d 844, cert. denied, 279 Conn. 907, 901 A.2d 1228 (2006).

A

The first portion of the defendant's claim is that the chisel was not relevant and, therefore, not properly admitted as evidence. The defendant argues that because the police had access to the victim's car, the chisel was not relevant absent a showing that the police "could not have accidentally dropped the chisel in the car while processing it for evidence." We do not agree.

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . Evidence is relevant if it tends to make the existence or nonexistence of any other fact more probable or less probable than it would be without such evidence. . . . To be relevant, the evidence need not exclude all other possibilities; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree. . . . The determination of whether a matter is relevant to a material issue rests within the sound discretion of the trial court." (Citation omitted; internal quotation marks omitted.) *State* v. *Miller*, supra, 95 Conn. App. 387–88.

In this case, the chisel was relevant because it aided the jury in determining material issues. The victim testified that she found the chisel in her car about one week after her assault and that her attacker held something that was knife-like in appearance. Furthermore, she testified that the chisel did not belong to her or to her fiance. The state was not required to exclude other possible explanations for the chisel's location in the victim's car for the chisel to be relevant. Although the victim did not state definitively that her attacker was holding the chisel, her testimony permitted a reasonable inference that the chisel was either the knife-like object used by her attacker or somehow left behind by her

attacker when he exited her car. Accordingly, the court did not abuse its discretion in finding that the chisel was relevant.

## B

The next portion of the defendant's claim is that the chisel improperly was admitted as evidence because its chain of custody was not established. Specifically, the defendant argues that the state failed to prove that the chisel was in substantially the same condition as when the crime was committed. We disagree.

"An object connected with the commission of a crime must be shown to be in substantially the same condition as when the crime was committed before it can be properly admitted into evidence. . . . The court has broad discretion on this evidentiary issue, and its ruling may not be overturned on appellate review except for a clear abuse of discretion. . . . The state's burden with respect to establishing a chain of custody is met by showing that it is reasonably probable that the substance has not been changed in important respects . . . . The court must consider the nature of the article, the circumstances surrounding its preservation and custody and the likelihood of intermeddlers tampering with it . . . . There is no hard and fast rule that the state must exclude or disprove all possibility that the article has been tampered with." (Citations omitted; internal quotation marks omitted.) *State* v. *Green*, 55 Conn. App. 706, 713, 740 A.2d 450 (1999), cert. denied, 252 Conn. 920, 744 A.2d 438, cert. denied, 529 U.S. 1136, 120 S. Ct. 2019, 146 L. Ed. 2d 966 (2000); see also *State* v. *Johnson*, 162 Conn. 215, 232–33, 292 A.2d 903 (1972).

In the present case, the court could have found that the testimony of both the victim and Rainone made it reasonably probable that the chisel was in substantially the same condition at trial as when the crime was committed. The victim testified that the chisel shown to

her in court was the same chisel that she gave to the Waterbury police department. Although the victim also testified that the chisel the prosecutor showed her had some "pink stuff" on its tip that was not present when she discovered it in her car, the important aspects of the chisel were in no way altered. Furthermore, the victim testified that the differences in the chisel appeared to be some type of oxidation that occurred since she had handed it over to the Waterbury police department.

Rainone then testified that the chisel was in substantially the same condition as when he sealed it in the evidence bag. He also testified that the evidence bag was labeled with the correct case number but initially mislabeled with the wrong name. Subsequently, the bag was relabeled to include the victim's name.

The testimony of the victim and Rainone, taken together, provide an adequate basis for admitting the evidence as unchanged and untampered. See *State* v. *Barnes*, 47 Conn. App. 590, 595, 706 A.2d 1000 (1998) (witness' certitude, prior knowledge, intimacy with evidence, standing alone, provided adequate basis for admitting evidence). The testimony elicited from the victim established that the chisel was in the same condition as when she found it. The testimony elicited from Rainone demonstrated an adequate and secure chain of custody. Accordingly, the court did not abuse its discretion in admitting the chisel into evidence.

### III

The defendant's third claim is that he was deprived of a fair trial because of prosecutorial impropriety.[6]

---

[6] The defendant labels his claim as one of prosecutorial misconduct. We note that in *State* v. *Fauci*, 282 Conn. 23, 917 A.2d 978 (2007), our Supreme Court stated: "The use of the term 'prosecutorial impropriety,' when reviewing allegedly improper statements by a prosecutor at trial, is more appropriate than the traditional term of 'prosecutorial misconduct' in light of our analysis under *State* v. *Williams*, 204 Conn. 523, 529 A.2d 653 (1987). Prosecutors make countless discretionary decisions under the stress and

Specifically, he claims that the prosecutor engaged in impropriety during closing arguments by arguing that (1) the victim's senses and awareness were heightened by the situation in which she found herself, (2) the chisel was an uncommon type, (3) a witness had seen the defendant with a chisel of the same model and (4) the substance on the chisel was consistent with the way the defendant would have used the chisel at his place of employment. We disagree.

Although the defendant objected to some of the language he now claims resulted in prosecutorial impropriety, "we note at the outset that a claim of prosecutorial [impropriety] need not be preserved to warrant our review. Typically, if a defendant fails to preserve a claim for appellate review, we will not review the claim unless the defendant is entitled to review under the plain error doctrine or the rule set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). . . . In cases of unpreserved claims of prosecutorial [impropriety], however, it is unnecessary for the defendant to seek to prevail under the specific requirements of . . . *Golding* . . . and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test. The reason for this is that the touchstone for appellate review of claims of prosecutorial [impropriety] is a determination of whether the defendant was deprived of his right to a fair trial, and this determination must

pressure of trial. A judgment call that we later determine on appeal to have been made improperly should not be called 'misconduct' simply because it was made by a prosecutor. To label what is merely improper as misconduct is a harsh result that brands a prosecutor with a mark of malfeasance when his or her actions may be a harmless and honest mistake. Though our analysis does not change, this new terminology better reflects the actions of a prosecutor under *Williams* because the first part of our analysis looks at whether the actions of the prosecutor are improper rather than the effects of those actions on the fairness of the trial. . . . If these actions do, in fact, so infect the trial with unfairness as to make the resulting conviction a denial of due process, they rise to the level of harmful impropriety." (Citation omitted.) *State* v. *Fauci*, supra, 26 n.2.

involve the application of the factors set out by this court in *State* v. *Williams,* 204 Conn. 523, 540, 529 A.2d 653 (1987). . . .

"In analyzing claims of prosecutorial [impropriety], [a reviewing court should] engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. . . .

"In addition, we are guided by standards of review concerning claims of prosecutorial [impropriety] during closing argument. [P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such [impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. . . .

"Or to put it another way while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

. . . A prosecutor must draw a careful line. On the one hand, he should be fair; he should not seek to arouse passion or engender prejudice. On the other hand, earnestness or even a stirring eloquence cannot convict him of hitting foul blows." (Citations omitted; internal quotation marks omitted.) *State* v. *D'Haity*, 99 Conn. App. 375, 382–84, 914 A.2d 570, cert. denied, 282 Conn. 912, 924 A.2d 137 (2007).

Our thorough review of the record fails to reveal any instances of prosecutorial impropriety. The prosecutor stated during closing arguments that the victim's senses and ability to recall were heightened by the conditions in which she found herself. The prosecutor then listed specific conditions about which the victim testified, which could have heightened her senses and ability to recall, namely, the length of time she spent with the defendant, her proximity to the defendant, her clear view of the defendant, the lighting of the car and her touching of and talking to the defendant. In light of the victim's testimony, the prosecutor's argument was based on facts in evidence and the reasonable inferences drawn from them. Accordingly, this argument was not improper.

The prosecutor also made reference to the testimony of the defendant's former employer, Nicola Pennacchio. Pennacchio testified that the particular type of chisel in this case was a Marples brand chisel, which is an uncommon type of chisel for his employees to have, and that the defendant had carried one. Pennacchio also testified that this type of chisel would be used to plug holes and shave wood, acts that would cause it to come in contact with glue or water. In such instances, the chisel could oxidize and turn black when exposed to oak. On the basis of Pennacchio's testimony, the prosecutor's arguments concerning how uncommon the

chisel is, the chisel's model and how the chisel's markings were consistent with its use as part of the defendant's former job find their basis in facts in the evidence and reasonable inferences drawn from them. From our review of the record, it is clear that the prosecutor did not engage in impropriety during her closing arguments.

## IV

The defendant's final claim is that the court's use of the standard Chip Smith charge violated his right to a trial by jury.[7] Specifically, the defendant claims that the standard Chip Smith charge is unconstitutional. We disagree.

The court's charge was identical to the one approved by our Supreme Court in *State* v. *O'Neil*, 261 Conn. 49, 801 A.2d 730 (2002) (en banc). As an intermediate appellate court, we are bound by Supreme Court precedent and are unable to modify it, as the defendant's counsel has conceded.[8] *Hopkins* v. *Commissioner of Correction*, 95 Conn. App. 670, 672, 899 A.2d 632, cert. denied, 279 Conn. 911, 902 A.2d 1071 (2006). "[W]e are not at liberty to overrule or discard the decisions of our Supreme Court but are bound by them. . . . [I]t is not within our province to reevaluate or replace those

---

[7] "The purpose of the [Chip Smith] instruction is to prevent a hung jury by urging the jurors to attempt to reach agreement. It is a settled part of Connecticut jurisprudence . . . . Better than any other statement . . . it makes clear the necessity, on the one hand, of unanimity among the jurors in any verdict, and on the other hand the duty of careful consideration by each juror of the views and opinions of each of his fellow jurors . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Feliciano*, 256 Conn. 429, 439, 778 A.2d 812 (2001). The standard language contains the admonition that the trial court is not compelling the jury to reach a verdict. The second half of the instructions merely explains the deliberative process to the jury. Id., 441.

[8] We note that the defendant conceded in his brief and at oral argument that this claim is controlled by the precedent of *State* v. *O'Neil*, supra, 261 Conn. 49, and that "[t]he issue is raised and briefed for the sake of future review."

decisions." (Internal quotation marks omitted.) *Mazzuca* v. *Sullivan*, 94 Conn. App. 97, 102, 891 A.2d 83, cert. denied, 278 Conn. 905, 896 A.2d 107 (2006). Accordingly, we decline to address the defendant's claim further.

The judgment is affirmed.

In this opinion the other judges concurred.