STATE OF CONNECTICUT *v.* PEDRO CUSTODIO
(AC 32527)

DiPentima, C. J., and Gruendel and Foti, Js.

Argued November 8, 2010—officially released February 15, 2011

*Temmy Ann Pieszak*, chief of habeas corpus services, for the appellant (defendant).

*Robert J. Scheinblum*, senior assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, *Eva Lenczewski*, supervisory assistant state's attorney, and *Catherine Brannelly Austin*, senior assistant state's attorney, for the appellee (state).

*Opinion*

GRUENDEL, J. The defendant, Pedro Custodio, appeals from the judgment of the trial court committing him to the custody of the commissioner of mental health and addiction services (commissioner) and requiring him to submit to periodic competency evaluations pursuant to General Statutes (Rev. to 2009) § 54-56d (m).[1] The defendant claims that the court improperly (1) concluded that § 54-56d (m), as amended by Public Acts 1998, No. 98-88, § 2 (act), applies retroactively, (2) concluded that it possessed personal jurisdiction over him, (3) ordered him to submit to periodic competency evaluations and (4) denied his motion to recuse. We affirm the judgment of the trial court.

On Cherry Street in Waterbury in 1991, the defendant allegedly fired multiple gunshots into the neck of the victim, Americo Pagan Cruz, causing his death. He subsequently was arrested and charged by information with

---

[1] General Statutes § 54-56d was amended by Public Acts 2010, No. 10-28, effective October 1, 2010. That amendment has no bearing on the present appeal and, unless otherwise indicated, our references to the statute are to the 2009 revision thereof.

murder in violation of General Statutes § 53a-54a. Following a hearing, the court found that the state had presented sufficient evidence to find probable cause to believe that the defendant committed the crime charged. A competency hearing thereafter was conducted on October 25, 1991, pursuant to General Statutes (Rev. to 1991) § 54-56d, at the conclusion of which the court found that the defendant was incompetent and ordered that efforts be made to restore his competency. On February 10, 1992, the court conducted a second competency hearing. At its conclusion, the court found that the defendant remained incompetent and that there was no substantial probability that he would regain competence. Accordingly, the court ordered that he be committed to the custody of the commissioner of mental health for purposes of applying for civil confinement. The defendant subsequently was civilly committed and placed in the Fairfield Hills Hospital in the summer of 1992.[2]

Months later and unbeknownst to the court or the state's attorney, the defendant was released from that hospital and thereafter lived at various residences in Waterbury for approximately eighteen years. At all times, his criminal case remained open on the criminal docket of the Superior Court for the judicial district of Waterbury.

In July, 2010, the clerk's office brought the defendant's open criminal file to the attention of the court. In response, the court, *Damiani, J.*, ordered a hearing to be held on July 26, 2010. Because notice of the hearing was not provided to the defendant, he did not appear. At that hearing, the state's attorney explained that she recently had learned, "to . . . my horror . . . that [the

---

[2] Fairfield Hills Hospital was "a public facility for the diagnosis, observation or treatment of persons with psychiatric disabilities . . . ." (Internal quotation marks omitted.) *Phoebe G.* v. *Solnit*, 252 Conn. 68, 75, 743 A.2d 606 (1999).

defendant] was released later in 1992. . . . We were never notified, the state was never notified, the clerk's office was never notified. This file apparently is kept in their statistical list of . . . somewhat active cases, and no one had any idea that this had occurred." She therefore requested that a failure to appear warrant issue. The local public defender objected to that request due to the lack of notice to the defendant. In granting the state's request, the court stated: "Here, we have a man who's charged with murder, an alleged shooting, going back to 1991; he's found to be not competent and not restorable, he's committed to the [commissioner] for civil confinement. He gets committed. They then release him in 1992. He never tells the court one way or another . . . doesn't contact his lawyer, the state's attorney or the court. They release him to the community. [The defendant], if he's still alive, has been walking as a free man for the past eighteen years, charged with murder. I understand . . . if in fact the state went to trial on a failure to appear charge [that it] could not prove a wilful, intentional failure to appear, but I have to set the wheels in motion to find [the defendant], to get him before me, to order another competency exam; if he is not restorable, see where he's going to go so we know exactly where he is, rather than having him walking the streets and, God forbid, something happen[s]. . . . If [the defendant] comes in, I'll dismiss the failure to appear [charge] . . . ." The defendant was arrested later that day.

On July 27, 2010, the defendant was arraigned. At the outset, the court noted that, "[a]t present, [the defendant] is charged with murder and failure to appear in the first degree." Acknowledging that the defendant was not provided notice of the prior day's proceeding, the court dismissed the failure to appear charge. As to the remaining murder charge, the court advised the defendant of his rights, ordered a bond in the amount

of $200,000 and scheduled a competency hearing for August 24, 2010.

On August 2, 2010, the defendant filed an objection to the proceedings predicated on lack of personal jurisdiction due to his allegedly unlawful arrest and the retroactive application of § 54-56d (m). The defendant also filed a motion to recuse the trial judge and an offer to participate in voluntary reexamination of his competency, subject to certain conditions. After hearing argument thereon, the court denied those motions.

The court held a competency hearing on August 24, 2010. At its conclusion, the court found that the defendant remained incompetent and that there was not a substantial probability that his competence could be restored. Pursuant to § 54-56d (m), the court ordered that the defendant be committed to the custody of the commissioner, that he be provided services in a less restrictive setting than civil confinement and that he submit to periodic competency evaluations. From that determination, the defendant appeals.

I

Before considering the defendant's claims, we first address the threshold question of whether this court lacks subject matter jurisdiction over the appeal. "The lack of a final judgment implicates the subject matter jurisdiction of an appellate court to hear an appeal. A determination regarding . . . subject matter jurisdiction is a question of law [over which we exercise plenary review]." (Internal quotation marks omitted.) *State* v. *Rhoads*, 122 Conn. App. 238, 242, 999 A.2d 1, cert. denied, 298 Conn. 913, 4 A.3d 836 (2010). "In a criminal proceeding, there is no final judgment until the imposition of a sentence. . . . [Our Supreme Court nonetheless has] determined . . . that certain interlocutory orders have the attributes of a final judgment and consequently are appealable under . . . [General Statutes]

§ 52-263. . . . In *State* v. *Curcio*, [191 Conn. 27, 31, 463 A.2d 566 (1983)], [the court] explicated two situations in which a party can appeal an otherwise interlocutory order: (1) [when] the order or action terminates a separate and distinct proceeding, or (2) [when] the order or action so concludes the rights of the parties that further proceedings cannot affect them." (Citation omitted; internal quotation marks omitted.) *State* v. *Jenkins*, 288 Conn. 610, 617–18, 954 A.2d 806 (2008). That second situation "focuses on the nature of the right involved. It requires the parties seeking to appeal to establish that the trial court's order threatens the preservation of a right already secured to them and that that right will be irretrievably lost and the [party] irreparably harmed unless they may immediately appeal. . . . Thus, a bald assertion that the defendant will be irreparably harmed if appellate review is delayed until final adjudication . . . is insufficient to make an otherwise interlocutory order a final judgment. One must make at least a colorable claim that some recognized statutory or constitutional right is at risk." (Internal quotation marks omitted.) Id., 618.

In the present case, the defendant claims that the court improperly applied § 54-56d (m) retroactively. Because that statute as it existed at the time of his arrest in 1991 did not authorize the court to order him to submit to periodic competency evaluations, he maintains that he has a statutory interest to not be subject thereto. He further argues that "[i]n light of his lack of competence and the fact that he cannot be restored, this case will never come to trial and never result in a final judgment from which the defendant might appeal in a belated effort to establish that he was not lawfully subjected to reexaminations, reports to the court and court appearances." We agree, and note that in *Jenkins*,

our Supreme Court held that a presentence order issued pursuant to § 54-56d was appealable immediately because "if the trial court's decision is erroneous, [the defendant's right to due process] will be irretrievably lost and the [defendant will be] irreparably harmed unless [he] may immediately appeal." (Internal quotation marks omitted.) *State* v. *Jenkins*, supra, 288 Conn. 619; see also *State* v. *Curtis*, 22 Conn. App. 199, 202–206, 576 A.2d 1299 (1990) (reviewing merits of appeal from interlocutory order issued pursuant to General Statutes [Rev. to 1987] § 54-56d [m] that imposed condition of release requiring annual periodic examinations of defendant's competency). Because the defendant raises a colorable claim that a presently existing statutory right is at risk, the interlocutory order of the trial court properly is before this court.

## II

The defendant contends that the court improperly applied § 54-56d (m), as amended by the act, in retroactive fashion. Whether that act applies retroactively is a question of law over which our review is plenary. *State* v. *Parra*, 251 Conn. 617, 622, 741 A.2d 902 (1999).

It is well established that "[w]hen construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be

considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ."[3] (Internal quotation marks omitted.) *Doe* v. *Norwich Roman Catholic Diocesan Corp.*, 279 Conn. 207, 212, 901 A.2d 673 (2006). In addition, "common sense must be used in statutory interpretation, and courts will assume that the legislature intended to accomplish a reasonable and rational result." (Internal quotation marks omitted.) *Cannata* v. *Dept. of Environmental Protection*, 239 Conn. 124, 141, 680 A.2d 1329 (1996).

Resolution of the issue of retroactive application of a statute hinges on the intent of the General Assembly in enacting it. *In re Eden F.*, 250 Conn. 674, 695, 741 A.2d 873, reargument denied, 251 Conn. 924, 742 A.2d 364 (1999). Our Supreme Court exhaustively analyzed the proper standards by which that intent is to be discerned in *State* v. *Skakel*, 276 Conn. 633, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006). After noting the long-standing rule of construction that "unless a contrary interpretation would frustrate an evident legislative intent, criminal statutes are governed by the fundamental principle that such statutes are strictly construed against the state"; (internal quotation marks omitted) id., 674; the court explained that "the principle of strict construction should not be applied in a manner that is hostile to an evident legislative purpose . . . or in a way that is contrary to common sense" and emphasized that this principle was "merely one among various aids which may be useful" in interpreting criminal statutes. (Citation omitted; internal quotation marks omitted.) Id., 678–79.

---

[3] The act is silent on the issue of retroactive application.

Accordingly, the court determined that to discern legislative intent in enacting a criminal statute, its "point of departure is . . . [General Statutes] § 55-3, which . . . we have uniformly interpreted . . . as a rule of presumed legislative intent that statutes affecting substantive rights shall apply prospectively only. . . . The Legislature only rebuts this presumption when it clearly and unequivocally expresses its intent that the legislation shall apply retrospectively." (Internal quotation marks omitted.) Id., 680. It continued: "As a corollary to this principle, we also have presumed that procedural or remedial statutes are intended to apply retroactively absent a clear expression of legislative intent to the contrary . . . . While there is no precise definition of either [substantive or procedural law], it is generally agreed that a substantive law creates, defines and regulates rights while a procedural law prescribes the methods of enforcing such rights or obtaining redress." (Citations omitted; internal quotation marks omitted.) Id., 680–81. At the same time, the court recognized that "[l]abeling a statute as substantive or procedural, however, will not always resolve the fundamental issue of legislative intent. Thus, we have recognized that [t]he test of whether a statute is to apply retroactively, absent an express legislative intent, is not a purely mechanical one and even if it is a procedural statute, which ordinarily will be applied retroactively without a legislative imperative to the contrary, it will not be applied retroactively if considerations of good sense and justice dictate that it not be so applied." (Internal quotation marks omitted.) Id., 685–86.

In the present case, the defendant claims that the act is substantive in nature, as it authorizes the court to compel his submission to periodic competency examinations. By contrast, the state maintains that the act is procedural. As such, it argues that "the canon of

construction that procedural statutes carry a presump-
tion of retroactivity"; id., 689; should apply. Before delv-
ing into that debate, a review of the pertinent statutory
provisions and history surrounding their enactment is
necessary.

It is undisputed that General Statutes (Rev. to 1991)
§ 54-56d (m) did not authorize the court to order peri-
odic competency evaluations of an incompetent defen-
dant, as was made abundantly clear in *State* v. *Curtis*,
supra, 22 Conn. App. 199, which, like the present case,
involved a defendant accused of murder. After finding
that the defendant was incompetent and that there was
no substantial probability that he would regain compe-
tence, the court "properly determined that its actions
were governed by . . . § 54-56d (m)." Id., 201. Because
it found that the defendant "did not qualify for place-
ment with any of the three statutory custodians because
he did not meet the statutory commitment criteria,"
the court ordered that the defendant be released from
custody, subject to the condition that he submit to
annual competency examinations. Id., 202. In his appeal
to this court, the defendant insisted that the trial court
lacked authority to impose that condition on his dis-
charge. In response, the state argued that "in the
absence of institutionalization of the defendant, the
imposition of a yearly examination was necessary for
the court to be kept abreast of possible improvements
in the defendant's mental state that may allow for the
prosecution to go forward." Id., 203.

In rejecting the state's contention, this court first
observed that § 54-56d "is drafted with clarity and preci-
sion, and addresses exactly what the court may do in
this factual situation." Id., 204. That statute "sets forth
with punctilious detail the actions to be taken by a
court in competency matters. Once the court makes
certain findings regarding the defendant's competency
and his chances for restoration; see General Statutes

§ 54-56d (f); the statute contains carefully drawn procedures that dictate precisely what the court may order with respect to the disposition of incompetent defendants." Id., 203. Turning our attention to subsection (m) of the statute, we stated that it "is specific in its mandate. It requires that 'the court shall either release the defendant from custody or order the defendant placed in the custody of . . . [one of three] commissioner[s]. The commissioner given custody or his designee shall then apply for civil commitment according to chapter 306 or 368t. . . . A defendant who is not civilly committed as a result of an application made by the commissioner . . . pursuant to this section *shall be released.*' . . . This clear and unambiguous language does not by its express terms give the court discretion to impose conditions on an incompetent defendant's release, and we find no basis for the implied authority to do so." (Emphasis in original.) Id., 203–204. In construing the statute as a whole, this court further noted that "[§] 54-56d (i) expressly provides for conditions of release in connection with outpatient treatment. Had the legislature intended that conditions of release be imposed on incompetent defendants who have no substantial probability of regaining competency, it could have readily included the necessary language." Id., 205.

As a final matter, we stated that the imposition of periodic competency evaluations on the defendant is not "an inconsequential matter," as such a condition constitutes an impingement on the defendant's freedom. Id. In a statement directed to the parties and, presumably, the General Assembly, we concluded: "It may well be beneficial for the state to have a formal mechanism to follow the progress of a harmless incompetent defendant who stands little chance of recovery. Absent statutory authority to do so, however, we will not strain the plain wording of the statute to reach such a result." Id., 206.

The General Assembly responded by passing the act, which amended subsection (m) of the statute to provide, inter alia, that "[i]f the court orders the release of a defendant charged with the commission of a crime that resulted in the death or serious physical injury, as defined in section 53a-3, of another person, it may, on its own motion or on motion of the prosecuting authority, order, as a condition of such release, periodic examinations of the defendant as to his competency. . . ." Public Acts 1998, No. 98-88, § 2. The bill analysis of the act referenced the *Curtis* decision. Office of Legislative Research, Amended Bill Analysis for Substitute Senate Bill No. 610. More importantly, the legislative history thereon indicates that the act was intended to "solve [the] problem" that plagued *Curtis*. 41 H.R. Proc., Pt. 6, 1998 Sess., p. 1995, remarks of Representative Michael P. Lawlor. As Representative Lawlor, who moved for the acceptance of the favorable report of the joint committee on the judiciary and for the passage of the bill, explained in the House of Representatives: "[This bill] seeks to solve a problem which emerged in a case which received a great deal of notoriety involving a young man accused of murder where he had inflicted a gunshot wound on himself as part of the incident, allegedly, and as a consequence received a brain injury and subsequently was found incompetent to stand trial. In that particular case the case would be continued pursuant to the existing law. The time period to return the competency expired. The [s]tate was required to, in essence, drop the charges temporarily until such time as he returned to competency. Well, a number of years went by and notwithstanding the efforts of the prosecutor to continue to have that person tested to see if he had regained competency, no such test took place. He ultimately enrolled in a university and was attending pre-med classes and apparently doing quite well academically. When the news media found out that this

was going on they publicized the case and I think it was an embarrassment to all of us policy makers and players in the criminal justice system that such a thing was possible. In other words, you could be found incompetent to stand trial on a murder charge, left alone for many years, no one ever followed up the test, and it had to be discovered by the news media.

"So, this would solve that problem by allowing the court under these circumstances to order periodic testing to determine whether or not someone had been restored to competency, but only until the statute of limitations would expire in a particular case. . . . [O]f course, that's the existing law. In a murder case, by the way, there is no statute of limitations. So in a murder case there could be periodic testing for the remainder of the life of the one time defendant. So, Mr. Speaker, I think it's an important bill."[4] 41 H.R. Proc., supra, pp. 1995–97.

As amended by the act, § 54-56d (m) authorizes the court to order periodic competency evaluations of an incompetent defendant charged with the commission of a crime that resulted in death or serious physical injury. That provision is remedial in nature in that it was intended to "solve [the] problem which emerged" in the *Curtis* case, as Representative Lawlor indicated. Id., p. 1995. In *Curtis*, this court opined that "[i]t may well be beneficial for the state to have a formal mechanism to follow the progress of a harmless incompetent defendant who stands little chance of recovery"; *State v. Curtis*, supra, 22 Conn. App. 206; the subsequent enactment of the act provided that mechanism in plain language. That it is remedial in nature implicates the presumption that such statutes "are intended to apply

---

[4] Although Representative Lawlor did not expressly reference *Curtis* in his remarks, the factual scenario described therein plainly references that case. See *State* v. *Curtis*, supra, 22 Conn. App. 201.

retroactively absent a clear expression of legislative intent to the contrary . . . ." (Internal quotation marks omitted.) *State* v. *Skakel,* supra, 276 Conn. 680.

This court has described § 54-56d as a statute that "sets forth with punctilious detail the actions to be taken by a court in competency matters." *State* v. *Curtis,* supra, 22 Conn. App. 203. The statute vests in the court the authority to determine the proper disposition of an incompetent defendant. In so doing, the statute delineates "carefully drawn procedures" that dictate the parameters of that authority. Id. The ordering of periodic competency evaluations is such a procedure that the legislature, in amending § 54-56d (m), entrusted the trial court as a remedy in dealing with a defendant who is accused of a crime that resulted in death or serious physical injury and who is deemed to be incompetent with no substantial probability of regaining competency. As our Supreme Court has stated, "[p]rocedural statutes have been traditionally viewed as affecting remedies . . . ." *Moore* v. *McNamara,* 201 Conn. 16, 22, 513 A.2d 660 (1986). The act does not create, define or regulate a right; see *State* v. *Skakel,* supra, 276 Conn. 681; instead, it sets forth an additional procedure by which the court exercises its authority over certain incompetent defendants.

We are mindful of our observation in *Curtis* that the imposition of periodic competency evaluations on a defendant is not an inconsequential matter. *State* v. *Curtis,* supra, 22 Conn. App. 205. At the same time, it remains that the defendant in the present case stands accused of murder and is subject to certain procedures set forth by the legislature to deal with such persons in the event that they are found to be incompetent. Like the public act at issue in *State* v. *Parra,* supra, 251 Conn. 626, the act here "affects an area of the criminal process far removed from the actual criminal conduct for which the defendant originally was charged. [It]

does not change the elements of the crime with which the defendant was charged, alter the elements of his defense to that crime or make more burdensome the punishment for that crime, after its commission." Moreover, the imposition of periodic competency evaluations on a defendant accused of a crime such as murder does not implicate any ex post facto concerns; see U.S. Const., art. I, § 10; because such evaluations are not penal in nature. See *State* v. *Skakel*, supra, 276 Conn. 676. Rather, a statute authorizing the imposition of periodic competency evaluations is a procedural measure that attempts to safeguard the state's vital interest in prosecuting competent individuals accused of crimes that resulted in death or serious physical injury; see *State* v. *Iban C.*, 275 Conn. 624, 667, 881 A.2d 1005 (2005); while at the same time shielding from prosecution an incompetent defendant. See *Pate* v. *Robinson*, 383 U.S. 375, 378, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966).

In light of the foregoing, we apply the presumption that "procedural or remedial statutes are intended to apply retroactively absent a clear expression of legislative intent to the contrary . . . ." (Internal quotation marks omitted.) *State* v. *Skakel*, supra, 276 Conn. 680. The legislative history clearly evinces a remedial intent to "solve [the] problem" of *Curtis*; 41 H.R. Proc., supra, p. 1995; in which the trial court was unable to implement "a formal mechanism to follow the progress of a harmless incompetent defendant"; *State* v. *Curtis*, supra, 22 Conn. App. 206; so as to "be kept abreast of possible improvements in the defendant's mental state that may allow for the prosecution to go forward." Id., 203. We further are cognizant that "[t]he test of whether a statute is to apply retroactively, absent an express legislative intent, is not a purely mechanical one . . . ." (Internal quotation marks omitted.) *State* v. *Skakel*, supra, 685–86. Common sense persuades us that, in enacting this amendment to § 54-56d (m), our General Assembly did

not intend for it to apply *only* to crimes committed by incompetent defendants that resulted in death or serious physical injury that transpired *on or after* October 1, 1998. It seems a bizarre and unintended result for the legislature to have exempted from this enactment crimes committed by incompetent defendants that resulted in death or serious physical injury prior to that date. We decline to so interpret § 54-56d (m); see *State v. Parra,* supra, 251 Conn. 631–32; as such a reading would not solve the problem described by Representative Lawlor—it would solve only part of the problem. Accordingly, we conclude that the court properly determined that § 54-56d (m), as amended by the act, applies retroactively.

### III

The defendant also claims that the court improperly concluded that it possessed personal jurisdiction over him. Because he was not provided notice of the July 26, 2010 hearing, he insists that personal jurisdiction was lacking. We disagree.

At the outset, we note our agreement with the defendant that the court improperly signed the failure to appear warrant when it was aware that the defendant had not been provided notice of the July 26, 2010 proceeding. Despite the court's reasonable doubt regarding the competency of an accused murderer who had spent the past eighteen years as a free man in Waterbury, the manner in which it attempted to ascertain his present condition was misguided.

We nevertheless disagree with the defendant that the court lacked personal jurisdiction over him. Personal jurisdiction requires that "the parties must have been properly served and brought before the court"; *State v. Anthony,* 24 Conn. App. 195, 201, 588 A.2d 214, cert. dismissed, 218 Conn. 911, 591 A.2d 813, cert. denied, 502 U.S. 913, 112 S. Ct. 312, 116 L. Ed. 2d 254 (1991);

which presents a question of law subject to plenary review. *Myrtle Mews Assn., Inc.* v. *Bordes*, 125 Conn. App. 12, 15, 6 A.3d 163 (2010). It is undisputed that the information filed in 1991 alleging that the defendant had committed the crime of murder in violation of § 53a-54a remained pending at the time of his 2010 arrest. As such, it would have been more prudent for the court simply to issue a warrant for the defendant's arrest predicated on that information. See General Statutes § 54-2a. Any impropriety in the manner in which the defendant was brought before the court, thus, is harmless in light of the court's continuing jurisdiction over his criminal case. Cf. *State* v. *Luzietti*, 230 Conn. 427, 432, 646 A.2d 85 (1994) ("the court loses jurisdiction over the case when the defendant is committed to the custody of the commissioner of correction and begins serving the sentence"). As we have noted, "[o]ur Supreme Court has long held that an illegal arrest does not deprive the court of personal jurisdiction over the defendant and, therefore, that it does not provide a valid basis for a motion to dismiss. See, e.g., *State* v. *Fleming*, 198 Conn. 255, 259–63, 502 A.2d 886, cert. denied, 475 U.S. 1143, 106 S. Ct. 1797, 90 L. Ed. 2d 342 (1986)." *State* v. *Therrien*, 117 Conn. App. 256, 262, 978 A.2d 556, cert. denied, 294 Conn. 913, 983 A.2d 275 (2009). The defendant's claim thus fails.

IV

The defendant further argues that the court improperly ordered him to submit to periodic competency evaluations. We disagree.

A

As a preliminary matter, we consider the standard of review applicable to the defendant's claim. The appropriate standard of review of a court's order regarding periodic competency evaluations pursuant to § 54-56d (m) raises a question of statutory interpretation over

which our review is plenary. See *Fort Trumbull Conservancy, LLC* v. *Planning & Zoning Commission*, 266 Conn. 338, 345, 832 A.2d 611 (2003); see also *State* v. *Johnson*, 253 Conn. 1, 22 n.23, 751 A.2d 298 (2000).

Section 54-56d (m) provides in relevant part that "[t]he court shall hear arguments as to whether the defendant should be released or should be placed in the custody of the Commissioner of Mental Health and Addiction Services, the Commissioner of Children and Families or the Commissioner of Developmental Services. If the court orders the release of a defendant charged with the commission of a crime that resulted in the death or serious physical injury, as defined in section 53a-3, of another person, or orders the placement of such defendant in the custody of the Commissioner of Mental Health and Addiction Services, the court may, on its own motion or on motion of the prosecuting authority, order, as a condition of such release or placement, periodic examinations of the defendant as to the defendant's competency. Such an examination shall be conducted in accordance with subsection (d) of this section. . . ." Our Supreme Court has explained that "[d]efinitive words, such as must or shall, ordinarily express legislative mandates of a nondirectory nature. . . . By contrast, [t]he word may, unless the context in which it is employed requires otherwise, ordinarily does not connote a command. Rather, the word generally imports permissive conduct and the conferral of discretion. . . . Therefore, when the legislature opts to use the words shall and may in the same statute, they must then be assumed to have been used with discrimination and a full awareness of the difference in their ordinary meanings." (Citations omitted; internal quotation marks omitted.) *Lostritto* v. *Community Action Agency of New Haven, Inc.*, 269 Conn. 10, 20, 848 A.2d 418 (2004). Section 54-56d (m) expressly indicates that the court may order periodic

competency examinations. We therefore conclude that a trial court's determination of whether to order such examinations under § 54-56d (m) properly is reviewed under the abuse of discretion standard.

## B

We thus turn to the question of whether the court abused its discretion in this instance. "In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Faraday*, 268 Conn. 174, 186, 842 A.2d 567 (2004).

The defendant maintains that the court lacked a rational basis for ordering periodic competency evaluations when there is no possibility that he ever will regain competence. We disagree. First and foremost, the plain language of § 54-56d (m) contains no such limitation on the discretion of the court. Moreover, as this court noted in *Curtis*, "[i]t may well be beneficial for the state to have a formal mechanism to follow the progress of a harmless incompetent defendant who stands little chance of recovery." *State* v. *Curtis*, supra, 22 Conn. App. 206. The General Assembly indicated its agreement with that sentiment when it passed the act in response to the *Curtis* decision. That formal mechanism reflects an interest in keeping "abreast of possible improvements in the defendant's mental state that may allow for the prosecution to go forward"; id., 203; for defendants accused of crimes that result in death or serious physical injury. We therefore conclude that the court did not abuse its discretion in ordering the defendant to submit to periodic competency examinations.

## V

The defendant's final claim is that the court abused its discretion in denying his motion for recusal. He

contends that the court's "actions were not only demonstrably improper and an abuse of power, but also created an appearance of impropriety" in violation of canons 1, 2 and 3 of the Code of Judicial Conduct (2010).[5] We do not agree.

The teaching of our Supreme Court instructs that "each case of alleged judicial impropriety must be evaluated on its own facts . . . ." *Abington Ltd. Partnership* v. *Heublein*, 246 Conn. 815, 826, 717 A.2d 1232 (1998), aff'd after remand, 257 Conn. 570, 778 A.2d 885 (2001). That inquiry is governed by the abuse of discretion standard of review.[6] Id., 824; see also *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, 292 Conn. 1, 28, 970 A.2d 656 (concluding that trial judge did not abuse his discretion in denying motion to recuse), cert. denied

---

[5] Canon 1 of the Code of Judicial Conduct (2010) provides: "An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective."

Canon 2 (a) of the Code of Judicial Conduct (2010) provides: "A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

Canon 3 (c) (1) of the Code of Judicial Conduct (2010) provides in relevant part: "A judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:

"(A) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding . . . ."

[6] In his reply brief, the defendant acknowledges that our Supreme Court has set forth the abuse of discretion standard as governing claims of judicial bias yet nevertheless submits that it "simply is the wrong standard." It is axiomatic that, as an intermediate appellate body, this court is "bound by Supreme Court precedent and [is] unable to modify it . . . . [W]e are not at liberty to overrule or discard the decisions of our Supreme Court but are bound by them. . . . [I]t is not within our province to reevaluate or replace those decisions." (Citation omitted; internal quotation marks omitted.) *State* v. *Smith*, 107 Conn. App. 666, 684–85, 946 A.2d 319, cert. denied, 288 Conn. 902, 952 A.2d 811 (2008). We therefore do not consider that claim.

sub nom. *Bridgeport Roman Catholic Diocesan Corp.* v. *New York Times Co.*, 558 U.S. 991, 130 S. Ct. 500, 175 L. Ed. 2d 348 (2009). "In applying that standard, we ask whether an objective observer reasonably would doubt the judge's impartiality given the circumstances. . . . If an objective observer, in view of all of the facts would reasonably doubt the court's impartiality, the court's discretion would be abused if a motion to recuse were not granted. In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Internal quotation marks omitted.) *Tracey* v. *Tracey*, 97 Conn. App. 278, 282, 903 A.2d 679 (2006).

As this court recently emphasized, "[a] charge of bias [or prejudice] must be deemed at or near the very top in seriousness, for bias kills the very soul of judging—fairness. . . . [A] charge of . . . bias [or prejudice] against a trial judge in the execution of his or her duties is a most grave accusation. It strikes at the very heart of the judiciary as a neutral and fair arbiter of disputes for our citizenry. Such an attack travels far beyond merely advocating that a trial judge ruled incorrectly as a matter of law or as to a finding of fact, as is the procedure in appellate practice. A judge's personal integrity and ability to serve are thrown into question, placing a strain on the court that cannot easily be erased. Attorneys should be free to challenge, in appropriate legal proceedings, a court's perceived partiality without the court misconstruing such a challenge as an assault on the integrity of the court. Such challenges should, however, be made only when substantiated by the trial record." (Internal quotation marks omitted.) *McKenna* v. *Delente*, 123 Conn. App. 137, 144–45, 1 A.3d 260 (2010). Accordingly, the burden rests with the

moving party to prove that the conduct in question gives rise to a reasonable appearance of impropriety. See *Abington Ltd. Partnership* v. *Heublein,* supra, 246 Conn. 820; *Tracey* v. *Tracey,* supra, 97 Conn. App. 285.

On our review of the circumstances surrounding the issuance of the July 26, 2010 failure to appear warrant and the various comments of the trial judge identified by the defendant in his motion to recuse, we cannot say that they would lead an objective observer to doubt the judge's impartiality. Two significant factors inform our consideration. First is the undisputed fact that the defendant's criminal file, in which he stood accused of murder in violation of § 53a-54a, remained pending at all times. Second, under § 54-56d, a competency evaluation is required any time a reasonable doubt is raised regarding a defendant's competency. *State* v. *Johnson,* supra, 253 Conn. 24. Upon learning that the defendant had been unconditionally released without notice to either the court or the state's attorney eighteen years earlier and that his competency not once had been evaluated in that time, the court had a reasonable doubt regarding the defendant's competency, which precipitated the events at issue here. As the trial judge stated at the August 2, 2010 hearing, "that rearrest warrant was done for one purpose only, to safeguard the people of Connecticut from a person charged with murder to see exactly what his present day circumstances are." Because the judge had jurisdiction over the defendant in light of his open criminal file and because he is authorized to order a competency hearing whenever a reasonable doubt arises, we believe that an objective observer with knowledge of all the facts would not conclude that the judge's actions in attempting to secure the defendant's presence for such a proceeding reflected partiality or called the judiciary into disrepute.

We similarly reject the defendant's contention that the judge's conduct and comments indicate that he had

prejudged the matter. Rather, the circumstances before us reveal a trial judge troubled by his reasonable doubt as to the competency of an accused murderer who had spent the past eighteen years living as a free man in Waterbury. At the time that the defendant's 1992 release was brought to his attention, the judge was uncertain whether the defendant's competency had been restored. Further, as the judge explained at the August 2, 2010 hearing, the defendant "was brought before this court to see exactly what the circumstances were and are in July of 2010." At that hearing, the court also stated that the defendant "may end up [back] at the place he came from with someone checking [on] how he's doing" following a competency hearing. Thereafter, the trial judge conducted an adversarial competency hearing on August 24, 2010, at which he heard expert testimony, prior to deciding the question of whether the defendant's competency had been restored. An objective observer reviewing this record reasonably would conclude that the judge simply wanted to secure the defendant's presence for a competency examination pursuant to § 54-56d to resolve his reasonable doubt as to the competency of an accused murderer. Accordingly, the court did not abuse its discretion in denying the motion to recuse.

The judgment is affirmed.

In this opinion the other judges concurred.