CITIZENS AGAINST OVERHEAD POWER LINE
CONSTRUCTION ET AL. *v.* CONNECTICUT
SITING COUNCIL
(AC 33362)

Robinson, Espinosa and Bishop, Js.

Argued April 10—officially released December 11, 2012

*Matthew C. McGrath,* for the appellants (named plaintiff et al.).

*Robert L. Marconi,* assistant attorney general, with whom, on the brief, was *George Jepsen,* attorney general, for the appellee (named defendant).

*Anthony M. Fitzgerald,* with whom, on the brief, was *Kurtis Z. Piantek,* for the appellee (defendant Connecticut Light and Power Company).

*Victoria P. Hackett,* staff attorney, with whom, on the brief, was *Elin Swanson Katz,* consumer counsel, for the appellee (defendant office of consumer counsel).

### Opinion

ESPINOSA, J. The plaintiffs Citizens Against Overhead Power Line Construction (association) and Richard M. Legere[1] appeal from the judgment of the Superior Court granting the motion to dismiss in favor of the defendants, the Connecticut Siting Council (siting council), the office of consumer counsel (consumer counsel) and the Connecticut Light & Power Company (power company). The plaintiffs claim that the court improperly determined that they lacked standing to bring the present action. The defendants claim that we need not reach the issue of standing because the plaintiffs failed to appeal to the Superior Court from a final decision by the siting council. We agree with the defendants. Accordingly, we affirm the judgment of the Superior Court.

The following undisputed facts are relevant to our consideration of this appeal. On October 20, 2008, the power company applied to the siting council for certificates of environmental and public need for the construction, operation and maintenance of the

---

[1] Legere is the executive director of the association. Angela Ciottone, an attorney, was added as a party plaintiff on July 23, 2010, but she participated only in the pretrial proceedings and is not a party to this appeal. Accordingly, in this opinion, we refer to the association and Legere as the plaintiffs.

Connecticut portion of the power company's Connecticut Valley Electric Transmission Reliability Projects (state project). The state project consisted of two component projects, the Greater Springfield Reliability Project (Springfield project) and the Manchester to Meekville Junction Circuit Separation Project (Manchester project). The siting council considered both aspects of the state project together under docket number 370A.

The power company designed the state project to cure deficiencies in existing electricity transmission lines in north-central Connecticut and the greater Springfield area. The siting council observed that the state project spanned both areas because the transmission systems of the two areas were interconnected. The siting council explained: "From the point of view of transmission, Greater Springfield and the adjacent portion of north-central Connecticut are effectively the same load area. Since key transmission lines in the system serving Greater Springfield terminate at substations in Connecticut, the resolution of Springfield area problems necessarily involves improvement to parts of Connecticut's electric grid as well. At the same time, the need to resolve these Springfield area problems offers an opportunity to reinforce the reliability of electric supply within north-central Connecticut, and improve the power transfer capacity between Massachusetts and Connecticut."

During the proceedings, the siting council granted party status to both the consumer counsel and the association. The association is an unincorporated group of individuals, including Legere, who own property in towns affected by the Springfield project portion of the state project.

On March 16, 2010, the siting council issued its decision on the power company's application. The siting

council, as a matter of procedure, generally issues a decision in three separate but related documents: (1) its findings of fact setting forth the background information underlying the application, (2) an opinion detailing the siting council's consideration of the application, and (3) a decision and order summarizing the action of the siting council on the application. In this case, the siting council issued one set of findings of fact but a separate opinion and decision and order for the Springfield project and the Manchester project. All documents were labeled with docket number 370A. The siting council granted the power company's application with respect to the Springfield project, but it denied without prejudice the application with respect to the Manchester project.

On April 7, 2010, the power company petitioned the siting council for reconsideration, which the siting council granted. In connection with the petition for reconsideration, the siting council heard additional testimony concerning the Manchester project. On July 20, 2010, the siting council issued its findings of fact, opinion and decision and order on the petition for reconsideration and granted the power company's application with respect to the Manchester project. The findings of fact, opinion and decision and order following reconsideration were issued under the docket number 370A-MR. The siting council's decision and order listed the association as a party to the proceedings on the petition for reconsideration.

On May 7, 2010, the plaintiffs filed the operative complaint in the Superior Court, appealing the March 16, 2010 decision of the siting council. The power company filed a motion to dismiss, alleging, among other things, that (1) the plaintiffs did not take their appeal from a final decision of the siting council and (2) the plaintiffs were not statutorily or classically aggrieved by the decision of the siting council.

On November 22, 2010, the court issued an order providing that "[t]he motion to dismiss is denied on the issue of subject matter jurisdiction ('not from a final decision') but as to the issue of aggrievement the matter is set down for an evidentiary hearing . . . ." In an articulation issued January 21, 2011, the court stated: "The question here is not whether the plaintiffs were permitted to wait until a new ruling was issued by the siting council on [the power company's] granted motion to reconsider; indeed, the plaintiffs were allowed to wait. See Public Acts 2006, No. 06-32; General Statutes § 4-183. Rather, the question is whether the court retains jurisdiction over this present May 7, 2010 appeal despite the fact that it was filed before the agency issued its opinion on reconsideration.

"Public Act 06-32 amended § 4-183 (c) in order to confer subject matter jurisdiction over an appeal if taken within forty-five days of a reconsidered decision. Specifically, it allows for an appeal (1) [w]ithin forty-five days after mailing of the final decision under section 4-180 . . . *or* (2) within forty-five days after the agency denies a petition for reconsideration of the final decision . . . *or* (3) within forty-five days after mailing of the final decision made after reconsideration . . . . The purpose of Public Act 06-32 was to correct the situation where an appeal on certain discrete issues, not reconsidered by an agency, would often be considered untimely if filed concurrently with the appeal of the reconsideration. The purpose was not to penalize an appellant who filed an appeal before reconsideration was completed by the agency.

"The appeal at issue in this case only concerns Suffield and associated towns, not the subject of [the power company's] motion to reconsider. Thus, the consideration of the appeal is not affected by the [siting council's] July 20 reconsideration decision." (Emphasis in original; internal quotation marks omitted.)

The court heard oral argument and received evidence on the question of whether the plaintiffs were aggrieved by the decision of the siting council. In a memorandum of decision issued March 24, 2011, the court stated that the plaintiffs had not been aggrieved by the decision of the siting council and, therefore, lacked standing to bring the present action. Accordingly, the court granted the motion to dismiss as to all parties. The plaintiffs filed the present appeal on April 13, 2011.

On appeal, the defendants renew their claim that the plaintiffs failed to appeal from a final decision of the siting council. The defendants assert that, pursuant to General Statutes §§ 4-181a (a) (4)[2] and 4-183,[3] the siting

[2] General Statutes § 4-181a (a) (4) provides: "Except as otherwise provided in subdivision (3) of this subsection, an agency decision made after reconsideration pursuant to this subsection shall become the final decision in the contested case in lieu of the original final decision for purposes of any appeal under the provisions of section 4-183, including, but not limited to, an appeal of (A) any issue decided by the agency in its original final decision that was not the subject of any petition for reconsideration or the agency's decision made after reconsideration, (B) any issue as to which reconsideration was requested but not granted, and (C) any issue that was reconsidered but not modified by the agency from the determination of such issue in the original final decision."

[3] General Statutes § 4-183 provides in relevant part: "(a) A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the Superior Court as provided in this section. The filing of a petition for reconsideration is not a prerequisite to the filing of such an appeal. . . .

"(c) (1) Within forty-five days after mailing of the final decision under section 4-180 or, if there is no mailing, within forty-five days after personal delivery of the final decision under said section, or (2) within forty-five days after the agency denies a petition for reconsideration of the final decision pursuant to subdivision (1) of subsection (a) of section 4-181a, or (3) within forty-five days after mailing of the final decision made after reconsideration pursuant to subdivisions (3) and (4) of subsection (a) of section 4-181a or, if there is no mailing, within forty-five days after personal delivery of the final decision made after reconsideration pursuant to said subdivisions, or (4) within forty-five days after the expiration of the ninety-day period required under subdivision (3) of subsection (a) of section 4-181a if the agency decides to reconsider the final decision and fails to render a decision made after reconsideration within such period, whichever is applicable and is later, a person appealing as provided in this section shall serve a copy

council's July 20, 2010 decision was the only final decision from which the plaintiffs properly could bring an appeal. We agree.

Whether the siting council's March 16, 2010 decision is a final decision from which the plaintiffs may appeal hinges on the operation of §§ 4-181a (a) (4) and 4-183 (c) (1). Accordingly, this case presents a question of statutory interpretation, over which our review is plenary. "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case." (Internal quotation marks omitted.) *Brouillard* v. *Connecticut Siting Council*, 133 Conn. App. 851, 855, 38 A.3d 174, cert. denied, 304 Conn. 923, 41 A.3d 662 (2012). General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

We conclude that, pursuant to the plain and unambiguous text of both §§ 4-181a (a) (4) and 4-183 (c), the only decision from which the plaintiffs properly could have appealed was the siting council's July 20, 2010 decision. In reaching this determination, we first consider the text of § 4-181a (a) (4), which provides in

of the appeal on the agency that rendered the final decision at its office or at the office of the Attorney General in Hartford and file the appeal with the clerk of the superior court for the judicial district of New Britain or for the judicial district wherein the person appealing resides or, if that person is not a resident of this state, with the clerk of the court for the judicial district of New Britain. . . ."

relevant part that "an agency decision made after reconsideration pursuant to this subsection shall become *the* final decision in the contested case *in lieu of* the original final decision for purposes of any appeal under the provisions of section 4-183, including, but not limited to, an appeal of (A) any issue decided by the agency in its original final decision that was not the subject of any petition for reconsideration or the agency's decision made after reconsideration . . . ." (Emphasis added.) General Statutes § 4-181a (a) (4). The siting council's July 20, 2010 decision reconsidered, and ultimately reversed, aspects of the March 16, 2010 decision relating to the Manchester project portion of the state project. The reconsideration did not address issues regarding the Springfield project portion of the state project. Therefore, this situation is governed by § 4-181a (a) (4) (A).

In this situation, § 4-181a (a) (4) provides by its plain and unambiguous terms that the agency decision made after reconsideration—in this case, the July 20, 2010 decision—replaces the original agency decision as the sole final decision of the agency. Even though the July 20, 2010 decision resolved only those issues relating to the Manchester project portion of the state project, it was the only decision from which the plaintiffs properly could have brought an appeal to the Superior Court.

This conclusion is consistent with the plain and unambiguous language of § 4-183 (c), which sets forth the time to appeal from the final decision of an agency. Section 4-183 (c) provides in relevant part: "(1) Within forty-five days after mailing of the final decision under section 4-180 or, if there is no mailing, within forty-five days after personal delivery of the final decision under said section, or (2) within forty-five days after the agency denies a petition for reconsideration of the final decision pursuant to subdivision (1) of subsection (a) of section 4-181a, or (3) within forty-five days after

mailing of the final decision made after reconsideration pursuant to subdivisions (3) and (4) of subsection (a) of section 4-181a or, if there is no mailing, within forty-five days after personal delivery of the final decision made after reconsideration pursuant to said subdivisions, or (4) within forty-five days after the expiration of the ninety-day period required under subdivision (3) of subsection (a) of section 4-181a if the agency decides to reconsider the final decision and fails to render a decision made after reconsideration within such period, *whichever is applicable and is later*, a person appealing as provided in this section shall serve a copy of the appeal on the agency that rendered the final decision . . . ." (Emphasis added.) Section 4-183 (c) (1) provides that, if there is no petition for reconsideration, an appeal shall be brought within forty-five days after the mailing of the final decision. Subdivisions (2) through (4) of § 4-183 (c) lay out the applicable times during which an appeal of a decision that was the subject of a petition for reconsideration may be brought.

The court determined that the disjunctive structure of § 4-183 (c)—subdivisions (1) through (4) are separated by the word "or"—indicated that the statute gives plaintiffs a choice of when to appeal an agency decision. That is, a plaintiff could choose to appeal an agency decision immediately under § 4-183 (c) (1) or could choose to appeal after the agency denied, granted or failed to act on a petition for reconsideration. We do not agree.

We conclude that § 4-183 (c) clearly lists four distinct scenarios and provides that a plaintiff shall appeal within whichever time frame is applicable and occurs latest. Although this court has stated that, generally, "[t]he last antecedent rule provides that qualifying phrases, absent a contrary intention, refer solely to the last antecedent in a sentence"; *Connecticut Ins. Guaranty Assn.* v. *Drown*, 134 Conn. App. 140, 151, 37

A.3d 820, cert. granted on other grounds, 305 Conn. 908, 44 A.3d 183 (2012); our Supreme Court has cautioned that "where a qualifying phrase is separated from several phrases preceding it by means of a comma, one may infer that the qualifying phrase is intended to apply to all its antecedents, not only the one immediately preceding it." *State* v. *Rodriguez-Roman*, 297 Conn. 66, 76, 3 A.3d 783 (2010). The phrase, "whichever is applicable and is later," appears only in § 4-183 (c) (4), but it is separated from the language that precedes it by a comma. Furthermore, § 4-183 (c) (4) does not present alternatives to which "whichever is applicable and is later" logically could apply. Therefore, we conclude that the only reasonable interpretation of § 4-183 (c) is that it lists four alternative time frames during which an appeal of an agency final decision may be brought, and that, in any given circumstance, only one such time frame will apply.

This reading of § 4-183 (c) is harmonious with our interpretation of § 4-181a (a) (4). Because § 4-181a (a) (4) provides that a reconsidered agency decision replaces the original agency decision as the sole final decision for purposes of an appeal, it follows logically that § 4-183 (c) does not provide a plaintiff with options of when an appeal may be taken. Rather, if an agency decision has not been the subject of a petition for reconsideration, under § 4-183 (c) (1), an appeal shall be brought within forty-five days of the mailing of such decision. If, however, the decision is the subject of a petition for reconsideration, the plaintiff shall bring an appeal within the time frame dictated by § 4-183 (c) (2), (3) or (4), depending on whether the agency denied, granted or failed to act on the petition for reconsideration. In this way, §§ 4-181a (a) (4) and 4-183 (c) work in concert to prevent the piecemeal appeal of an agency decision before the final resolution of all issues pre-

sented during the agency proceedings. In the present case, the plaintiffs failed to appeal from the July 20, 2010 decision, which, under § 4-181a (a) (4), was the only final decision for purposes of an appeal.[4] Accord-

---

[4] The dissent concludes that the word "may" in § 4-183 (a), as well as the "purpose of the 2006 amendments to the statute," largely govern an analysis of the timeliness of the present appeal. As stated previously, § 4-183 (a) provides in relevant part: "A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision *may* appeal to the Superior Court as provided in this section. . . ." (Emphasis added.) General Statutes § 4-183 (a). We interpret this prefatory language as it is written, merely to provide a right to appeal that is in accordance with the remainder of § 4-183. Mindful of the substantive distinction between "may" and "shall," we apply the word "may" to the words that immediately follow it in the statute. Thus, we interpret the statute to convey that the bringing of an appeal from a final agency decision, in accordance with the provisions of § 4-183, is a discretionary act. An appeal is timely, however, only if it is taken in accordance with § 4-183 (c) (1), which, by its terms, governs the timeliness of an appeal.

Additionally, we disagree that the plain language of the statute reflects that, by amending § 4-183 (c) (1), the legislature intended merely to "extend the permissive time for taking an appeal." As stated previously in this opinion, subsection (c) addresses four events directly related to an agency's final decision, and unambiguously provides that an appeal may be taken from "whichever is applicable and is later . . . ." General Statutes § 4-183 (c) (4). In our view, to permit an appellant, in its discretion, to bring an appeal from *any* of these four events would effectively render the phrase, "whichever is applicable and is later," meaningless. In our interpretation of statutory language, we must presume that "the legislature did not intend to enact meaningless provisions. . . . [S]tatutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant . . . ." (Internal quotation marks omitted.) *Housatonic Railroad Co.* v. *Commissioner of Revenue Services*, 301 Conn. 268, 303, 21 A.3d 759 (2011).

Last, the dissent suggests that the plaintiffs should be permitted to bring an appeal from the March 16, 2010 decision of the agency because they lacked any interest in the issues addressed in the motion for reconsideration filed by the power company. As the dissent notes, "[t]he motion for reconsideration was filed by [the power company] in response to the [siting council's] denial of its application regarding a geographic area of no immediate interest to the [plaintiffs]." Even if we assume that this is accurate, it does not follow that the plaintiffs necessarily lacked any "legal interest" in the reconsidered decision, as stated by the dissent. There is no dispute that the siting council considered both aspects of the state project together under the same docket number. Although the siting council ultimately issued separate decisions

ingly, the Superior Court lacked subject matter jurisdiction over their claims.

The judgment is affirmed.

In this opinion ROBINSON, J., concurred.

BISHOP, J., dissenting. In dismissing this appeal on the ground that the plaintiffs Citizens Against Overhead Power Line Construction (Citizens) and Richard M. Legere did not appeal to the Superior Court from a final decision by the defendant Connecticut Siting Council (siting council), the majority did not reach the issue of whether the trial court properly dismissed the plaintiffs' appeal on the ground that they lacked standing to appeal the decision of the siting council. Unlike the majority, I believe that the plaintiffs timely appealed to the Superior Court from a final decision of the siting council. I believe, as well, that Legere had standing to appeal the siting council's decision. Accordingly, I would reverse the judgment of the Superior Court as it relates to Legere and remand the matter to the Superior Court for a hearing on the merits of Legere's claims.

Because I agree, generally, with the majority's recitation of the procedural facts of this appeal, they need not be reiterated. Instead, I will focus on the issues in which I disagree with the majority.

and orders for the Springfield and Manchester projects, it nonetheless issued one set of findings of fact with regard to both projects. Because the siting council granted the motion for reconsideration, there remained a substantial likelihood that its reconsidered decision affected its findings concerning both projects and, thus, the decision at issue in the plaintiffs' appeal. The statutes at issue expressly provide a right to appeal from a "final decision" of an agency. General Statutes §§ 4-181a (a) (4) and 4-183 (a). There is no statutory support for the notion that a decision under reconsideration is the proper subject of an appeal by one of several parties aggrieved by an agency's original final decision. Instead, the proper subject of an appeal is the agency decision made after reconsideration, which "shall become the final decision in the contested case in lieu of the original final decision for purposes of any appeal . . . ." General Statutes § 4-181a (a) (4).

The majority concludes that the plaintiffs did not appeal from a final decision on the basis of its interpretation of General Statutes § 4-183, concerning administrative appeals to the Superior Court. Specifically, the majority fastens on § 4-183 (c) (4), which sets forth a time line for taking an appeal and concludes, from its reading of this subsection, that the plaintiffs did not timely appeal to the Superior Court from a final decision of the siting council. While I generally agree with the majority's recitation of the time line, I do not share the majority's view that this statutory subsection clearly and unequivocally mandates that a would-be appellant wait until the last possible moment to file an appeal. Rather, I believe § 4-183 (c), as amended, serves only to extend the permissive time for taking an appeal. Simply put, our difference boils down to the interpretation of the word "may" that is contained in § 4-183 (a), the prefatory sentence to this section.

Section 4-183 (a) provides: "A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision *may* appeal to the Superior Court as provided in this section. The filing of a petition for reconsideration is not a prerequisite to the filing of such an appeal." (Emphasis added.) Thereafter, the statute sets forth the various time periods following the rendering of a decision by an administrative agency in which an appeal may be taken to the Superior Court. Tracking the statute's time line enables the reader to understand that the latest time in which an appeal may be taken is forty-five days after the expiration of a ninety day period from the date an administrative agency decides to reconsider its decision but fails to actually render a reconsidered decision. General Statutes § 4-183 (c) (4). Because, in the present case, the plaintiffs appealed after the siting council's initial decision and did not wait until the siting council's reconsidered decision several months later,

the majority concludes that the plaintiffs' appeal was premature and, thus, untimely. Such an interpretation of the statute is, in my view, inconsistent with both the terms of the statute, as well as the purpose of the 2006 amendments to the statute, which specifically address the circumstances in which a motion for reconsideration is filed. See Public Acts 2006, No. 06-32 (P.A. 06-32). Indeed, a review of the legislation in question reveals that neither its context nor its purpose suggests the interpretation embraced by the majority.

As our canons of statutory interpretation instruct, I turn first to the language of the statute itself. See, e.g., *Thames Talent, Ltd.* v. *Commission on Human Rights & Opportunities*, 265 Conn. 127, 135, 827 A.2d 659 (2003). In common parlance, the word "may" denotes permissive behavior while the term "shall" implies directory or mandatory behavior. Our court has adopted this common sense approach to plain language. In a footnote to its opinion in *Taylor* v. *Commissioner of Correction*, 137 Conn. App. 135, 141 n.4, 47 A.3d 466 (2012), this court affirmed the classic distinction between the terms "shall" and "may." Responding to the plaintiff's argument in *Taylor* that the word "may" in General Statutes § 18-91a should be construed to mean "shall," the court responded: "We disagree. [A]s opposed to [d]efinitive words, such as must or shall, [which] ordinarily express legislative mandates of a nondirectory nature . . . the word *may* imports permissive conduct and the conferral of discretion. . . . Only when the context of legislation permits such interpretation and if the interpretation is necessary to make a legislative enactment effective to carry out its purposes, should the word *may* be interpreted as mandatory rather than directory." (Emphasis in original; internal quotation marks omitted.) *Taylor* v. *Commissioner of Correction*, supra, 141 n.4. Additionally, this court has previously stated that when a statute contains both of

the words "may" and "shall," those words "must then be assumed to have been used with discrimination and a full awareness of the difference in their ordinary meanings." (Internal quotation marks omitted.) *State* v. *Custodio*, 126 Conn. App. 539, 558, 13 A.3d 1119 (2011), aff'd, 307 Conn. 548, 56 A.3d 119 (2012). This court's observation in *Custodio* is pertinent to a consideration of the statute at hand. Section 4-183 (d), a subsequent subsection in the statute under scrutiny containing the term "may" regarding appeals, states that a person appealing, "not later than fifteen days after filing the appeal, *shall* file or cause to be filed with the clerk of the court an affidavit . . . ." (Emphasis added.) Thus, in accord with the holding of *Custodio*, we should not read the terms "may" and "shall" as synonymous in § 4-183 but, rather, should accord them the different meanings commonly associated with them.

The operative language regarding appeals to the Superior Court from administrative appeals in which motions for reconsideration have been filed was added to the statute in 2006 by the creation of three new subdivisions in § 4-183 (c). P.A. 06-32, § 2. In essence, the 2006 amendments enable a would-be appellant to await an agency's action on a motion for reconsideration before filing an appeal. As a result of the 2006 amendments, one may now bring an appeal to the Superior Court following an agency's agreement to reconsider its decision within a certain time from the agency's agreement to reconsider even in a circumstance in which the agency fails to timely render a decision after agreeing to reconsider its original decision. Nothing in the statute, however, mandates that an appellant await the agency's decision on a motion to reconsider before filing an appeal.[1]

---

[1] It is interesting, although I agree not persuasive, that my interpretation of the permissive nature of the 2006 amendments is consistent with Practice Book § 63-1 regarding appeals from the Superior Court. In pertinent part Practice Book § 63-1 (a) provides: "If a motion is filed within the appeal period that might give rise to a new appeal period as provided in subsection

The amendments also placed a cap on the amount of time an agency may take in rendering its decision once it has agreed to reconsider its initial decision. P.A. 06-32, § 1 (3). This understanding of the 2006 amendments to the statute is consistent with their stated purpose to permit a litigant to await an agency's decision on reconsideration rather than requiring the litigant to appeal first from the initial opinion and to make finite the time period in which a reconsidered decision must be made for appeal purposes. A review of the history of the 2006 amendments to § 4-183 (c) includes the following summary of the public act by the General Assembly's office of legislative research:

"SUMMARY: This act caps, at 90 days, the maximum time a state agency has to issue a new decision in a contested case it decides to reconsider. By law, agencies can decide to reconsider a final decision in a contested case on their own or pursuant to a petition from a party to the case.

"With one exception, the act provides that a decision an agency issues in a contested case on reconsideration replaces its original decision as the final decision from which an appeal may be taken. The exception applies if an agency fails to render a decision on reconsideration within the 90-day period the act establishes. In this case, the original decision is the final decision for purpose of an appeal. By law, an appeal may be based on a number of issues, including issues the agency (1) decided in its original final decision that were not the subject of the reconsideration; (2) was requested, but declined, to address on reconsideration; and (3) reconsidered but did not modify.

(c) of this rule, the appeal *may* be filed either in the original appeal period, which continues to run, or in the new appeal period. . . ." (Emphasis added.) I recite this provision only as a demonstration that such an interpretation of § 4-183 (c) is not absurd or contrary to general jurisprudence.

"Lastly, the act establishes a deadline for filing an appeal after a petition for reconsideration is filed. The deadline is 45 days after (1) the petition is denied, (2) a decision made after reconsideration is mailed or personally delivered, or (3) the 90-day deadline for the decision." Office of Legislative Research, Connecticut General Assembly, Summary of 2006 Public Acts (2006) p. 213.[2]

In my view, the majority's interpretation of § 4-183 is also not consonant with the statute's broader legislative context. Section 4-183 must be read in conjunction with the provisions of General Statutes § 4-181a concerning the reconsideration of decisions in contested cases. Section 4-181a (a) (3) contains the following pertinent provision: "If the agency decides to reconsider a final decision, pursuant to subdivision (1) or (2) of this subsection, the agency shall proceed in a reasonable time to conduct such additional proceedings as may be necessary to render a decision modifying, affirming or reversing the final decision, provided such decision made after reconsideration shall be rendered not later than ninety days following the date on which the agency decides to reconsider the final decision. If the agency fails to render such decision made after reconsideration within such ninety-day period, *the original final decision shall remain the final decision* in the contested case for purposes of any appeal under the provisions of section 4-183." (Emphasis added.) The import of this language is that an agency's original decision is, when

_____

[2] It appears that the 2006 amendment to § 4-183 making it permissible for an appellant to await an agency's reconsideration of a final decision before filing an appeal would have the effect of overturning the holding of this court in *Housing Authority* v. *State Board of Labor Relations*, 76 Conn. App. 194, 819 A.2d 296 (2003), appeal dismissed, 269 Conn. 798, 850 A.2d 142 (2004), in which this court, in a per curiam opinion, upheld the trial court's dismissal of an appeal not timely taken from a final decision in which a motion for reconsideration had been filed by another party on issues of no legal interest to the appellant.

entered, a final decision for appeal purposes, but, if the agency later reconsiders its decision, its action on the motion to reconsider replaces the original decision and becomes the final decision for appeal purposes. Nothing in that language suggests that a party who wants to immediately appeal an agency's final decision must await the agency's determination on a motion for reconsideration filed by another party on an issue of no interest to the appealing party. Such is the circumstance we presently face. As the majority correctly illuminates, the siting council had treated, as one case, applications by the defendant Connecticut Light and Power Company (power company) relating to two distinct geographic areas. While the siting council's decision affected both geographic areas, only one area was of interest to the appellants. The motion for reconsideration was filed by the power company in response to the siting council's denial of its application regarding a geographic area of no immediate interest to the appellants. To suggest that the appellants should be required to await the siting council's determination on the power company's motion to reconsider its decision of no pertinent interest to the appellants appears, to me, to turn the statute on its head. Rather than extending the time an appellant has to file an appeal and fixing that time despite any latent inactivity by an administrative agency, the majority reads the statute as requiring an appellant to await, possibly for several months, the outcome of postdecision litigation in which it has no legal interest. I do not believe such a reading of the statute is warranted either from its language or its stated purpose.

Having concluded that the plaintiffs did timely appeal to the Superior Court from a final decision of the siting council, I must also consider whether the court properly determined that the plaintiffs lacked standing on the

ground that they were not aggrieved by the siting council's decision. In this regard, I agree with respect to Citizens but not as to Legere.

"Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he [or she] has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. . . . Standing is established by showing that the party claiming it is authorized by statute to bring suit or is classically aggrieved. . . . Statutory aggrievement exists by legislative fiat, not by judicial analysis of the particular facts of the case. In other words, in cases of statutory aggrievement, particular legislation grants standing to those who claim injury to an interest protected by that legislation." (Citations omitted; internal quotation marks omitted.) *RMS Residential Properties, LLC* v. *Miller*, 303 Conn. 224, 229, 32 A.3d 307 (2011). "[T]o determine whether a party has standing to make a claim under a statute, a court must determine the interests and the parties that the statute was designed to protect. . . . Essentially the standing question in such cases is whether the . . . statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief. . . . The plaintiff must be within the zone of interests protected by the statute. . . . It has been [noted] that the zone of interests test bears a family resemblance to the scope of the risk doctrine in the law of torts. . . . In tort law, it is not enough that the defendant's violation of the law caused injury to a plaintiff. The defendant must also owe that plaintiff a duty. Similarly, with respect to the law of [statutory] standing, it is not enough that a party is injured by an act or omission of another party. The defendant must also have violated some duty *owed to the plaintiff.*" (Emphasis in original;

internal quotation marks omitted.) *Albuquerque* v. *State Employees Retirement Commission,* 124 Conn. App. 866, 873–74, 10 A.3d 38 (2010), cert. denied, 299 Conn. 924, 11 A.3d 150 (2011).

Both Legere and Citizens claim statutory aggrievement on the basis of the Public Utility Environmental Standards Act (PUESA), General Statutes § 16-50g et seq. The introductory portion of PUESA sets forth the General Assembly's legislative findings and the purpose of PUESA. In pertinent part, it states: "The legislature finds that power generating plants and transmission lines for electricity and fuels, community antenna television towers and telecommunication towers have had a significant impact on the environment and ecology of the state of Connecticut; and that the continued operation and development of such power plants, lines and towers, if not properly planned and controlled, could adversely affect the quality of the environment and the ecological, scenic, historic and recreational values of the state. The purposes of this chapter are: To provide for the balancing of the need for adequate and reliable public utility services at the lowest reasonable cost to consumers with the need to protect the environment and ecology of the state and to minimize damage to scenic, historic, and recreational values; to provide environmental quality standards and criteria for the location, design, construction and operation of facilities for the furnishing of public utility services at least as stringent as the federal environmental quality standards and criteria, and technically sufficient to assure the welfare and protection of the people of the state; to encourage research to develop new and improved methods of generating, storing and transmitting electricity and fuel and of transmitting and receiving television and telecommunications with minimal damage to the environment and other values described

above; to promote energy security . . . ." General Statutes § 16-50g. In subsequent parts, PUESA defines a facility as: "An electric transmission line of a design capacity of sixty-nine kilovolts or more . . . ." General Statutes § 16-50i (a) (2).

PUESA also establishes the siting council and sets forth the siting council's duties as well as the procedures for the siting council and applicants regarding applications for certificates of environmental compatibility and public need such as occurred in the case at hand. PUESA additionally includes statutory provisions setting substantive parameters for the siting council's decisions on applications regarding transmission wires. General Statutes § 16-50p (i) provides in relevant part: "For a facility described in subdivision (1) of subsection (a) of section 16-50i, with a capacity of three hundred forty-five kilovolts or greater, there shall be a presumption that a proposal to place the overhead portions, if any, of such facility adjacent to residential areas . . . is inconsistent with the purposes of this chapter . . . ." Finally, in this regard PUESA includes the following provision: "Any party may obtain judicial review of an order issued on an application for a certificate or an amendment of a certificate in accordance with the provisions of section 4-183. . . ." General Statutes § 16-50q.

PUESA, therefore, sets policy and procedures for the process by which the state responds to efforts by utility companies to provide services within the state. In doing so, the legislation attempts to strike a balance between the need for the availability of cost effective and technologically efficient utility services and protection of the environment and the ecology. Notably, PUESA also provides for judicial review of administrative orders made under the statutory scheme. See General Statutes § 16-50g et seq.

Although § 16-50q states that "[a]ny party" may obtain judicial review, I do not believe that PUESA operates to permit any person, no matter how tenuous the person's interest may be in the subject matter, to appeal a decision of the siting council. Rather, and consistent with our well established jurisprudence regarding statutory aggrievement, I believe that, in order to have standing to appeal from an order of the siting council, a person must demonstrate that he or she falls within the zone of interest PUESA is intended to protect. In this regard, I believe Legere enjoys a status that is not shared by Citizens.

A review of the complaint reveals that Citizens claims to be comprised of members who own property in the towns of Suffield and East Granby and whose property "benefits in value and desirability from its location in a scenic and historic district, which is part of and/or adjacent to the federally-recognized . . . Metacomet-Monadnock-Mattabesett trail." Notably, Citizens makes no claim in the complaint that would, either expressly or by implication, place its members within the protections afforded by the statutory scheme regarding the siting council's response to the power company's application.

Legere, however, alleges, and the court found, that he owns real property that is subject to an easement in favor of the power company and over which the proposed transmission line is intended to pass. As a property owner over whose property the proposed transmission lines would pass, Legere argued that he was entitled to the protections of the provisions of § 16-50p (i) that "[f]or a facility described in subdivision (1) of subsection (a) of section 16-50i with a capacity of three hundred forty-five kilovolts or greater, there shall be a presumption that a proposal to place the overhead portions, if any, of such facility adjacent to residential areas . . . is inconsistent with the purposes of this

chapter. . . ." General Statutes § 16-50p (i). Legere claims that the proposed 345 kilovolt transmission line would cause harm to his well-being and the enjoyment of his property. Whether or not he may ultimately succeed on the merits, I believe Legere's allegations are sufficient to place him within the zone of protection intended by § 16-50p. In short, Legere has standing because he is statutorily aggrieved. It is difficult to envision a circumstance in which a property owner over whose property transmission lines are intended to pass would not have standing to seek judicial review of an agency's order that relates directly to the passage of transmission lines over the subject property.

Finally, in regard to statutory aggrievement, it appears that the trial court determined that, by the reference in § 16-50q to § 4-183, the legislature intended that only those who are classically aggrieved have the right to appeal a siting council decision. I do not agree. Rather, I believe the reference in § 16-50q, regarding judicial review, to the Uniform Administrative Procedure Act, General Statutes § 4-166 et seq., simply establishes that anyone who is statutorily aggrieved may appeal in accordance with the procedures set forth in § 4-183 et seq. regarding administrative appeals generally. A contrary reading would render § 16-50q redundant, as one who is classically aggrieved by an administrative agency decision already has, without the benefit of § 16-50q, the right to appeal pursuant to the terms of § 4-183.[3]

---

[3] At first blush, this court's opinion in *Brouillard* v. *Connecticut Siting Council*, 133 Conn. App. 851, 38 A.3d 174, cert. denied, 304 Conn. 923, 41 A.3d 662 (2012), would appear to provide support for the view that, notwithstanding the provisions of § 16-50q, an appellant must demonstrate classical aggrievement in order to have standing to appeal from a decision of the siting council. Closer scrutiny reveals, however, that the appellant in *Brouillard* argued that § 16-50q conferred the right to appeal to anyone regardless of whether the person's rights and interests were within the zone of interest protected by the statute. In such case, the *Brouillard* court held that § 16-50q does not provide an automatic right to appeal and that such an applicant would be required to demonstrate classical aggrievement in

Even if it could reasonably be determined that neither Citizens nor Legere is statutorily aggrieved, I would find, nevertheless, that Legere has standing on the basis of classical aggrievement. I would find, as did the trial court, that Citizens is not classically aggrieved.

Regarding classical aggrievement, and in the context of an appeal from a land use agency, our Supreme Court has observed: "To be entitled to an appeal, the [plaintiffs were] required to allege and prove that [they were] aggrieved by the decision of the commission." *Fletcher* v. *Planning & Zoning Commission*, 158 Conn. 497, 501, 264 A.2d 566 (1969). "The fundamental test by which the status of aggrievement . . . is determined encompasses a well-settled twofold determination. First, the party claiming aggrievement must successfully demonstrate a specific, personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the decision." (Internal quotation marks omitted.) *Winchester Woods Associates* v. *Planning & Zoning Commission*, 219 Conn. 303, 307, 592 A.2d 953 (1991). To prove aggrievement, however, one need not prove harm on the merits. Rather, "[a]ggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." (Internal quotation marks omitted.) *Bakelaar* v. *West Haven*, 193 Conn. 59, 66, 475 A.2d 283 (1984); see also *New England Cable Television Assn., Inc.* v. *Dept. of Public Utility Control*, 247 Conn. 95, 103, 717 A.2d 1276 (1998). Regarding the quality of proof

order to have standing to appeal. Because, in my view, Legere's legal interests are well within the zone of interests PUESA is intended to protect, the holding in *Brouillard* is inapposite.

one must present to demonstrate adverse affects, our Supreme Court has previously opined: "When standing is put in issue, the question is whether the person whose standing is challenged is a proper party to request an adjudication of the issue and not whether the controversy is otherwise justiciable, or whether, on the merits, the plaintiff has a legally protected interest that the defendant's action has invaded." (Internal quotation marks omitted.) *Steeneck* v. *University of Bridgeport*, 235 Conn. 572, 579, 668 A.2d 688 (1995). In other words, to demonstrate standing, one need not prove his case on the merits. Rather, standing entails a consideration of whether there is a possibility that some legally protected interest of the person asserting a claim has been adversely affected by the actions of the defendant.

In the complaint, Citizens did not allege a "specific, personal and legal interest in the subject matter" of the siting council's decision as distinguished from a "general interest, such as is the concern of all members of the community as a whole," as is required to demonstrate classical aggrievement. (Internal quotation marks omitted.) *Quarry Knoll II Corp.* v. *Planning & Zoning Commission*, 256 Conn. 674, 702, 780 A.2d 1 (2001). Because the pleadings filed by Citizens did not allege a specific, personal and legal interest in the proposed transmission lines, they failed to satisfy the pleading component required to demonstrate classical aggrievement.

Contrary to Citizens' general claims of concern regarding the power company's proposed transmission lines, Legere alleged that he and his wife own real property located at 1204 Newgate Road, West Suffield, and that their personal and legal interests were directly affected by the power company's proposed activity. The court found, and I agree, that these pleadings were sufficient to establish Legere's direct and personal interest in the siting council's proposed activity beyond a

mere general concern. See *St. Germain* v. *LaBrie*, 108 Conn. App. 587, 949 A.2d 518 (2008). Notwithstanding the pleadings, the court found that Legere's proffer was inadequate to establish classical aggrievement.

Because it is not our function to find facts in assessing the correctness of the court's ruling on a motion to dismiss, but, instead, to take the facts as reasonably found by the court, it is appropriate to note some of the pertinent facts found by the court. The court made the following relevant findings of fact: (1) Legere purchased the premises at 1204 Newgate Road, West Suffield, in 1997; (2) the power company has a right-of-way (easement) for 115 kilovolt (115 kV) electric transmission lines; (3) the 345 kilovolt (345 kV) transmission line is proposed to be built in this same right-of-way; (4) the right-of-way traverses Legere's property for four or five acres and is 305 feet wide; (5) the 345 kV line would be at least thirty or thirty-five feet above the ground; (6) Legere is allowed under the terms of the grant of the right-of-way to use the land for agricultural purposes, including raising chickens and alpacas, and growing crops such as hay and produce; (7) there is an apple orchard near, but not inside, the right-of-way; (8) during the winter months, Legere is rarely in the right-of-way, but during the other seasons, he estimates that he spends four to five hours a day in the right-of-way, under the electric wires; and (9) under § 2 of the right-of-way, which was granted in 1970 by Legere's predecessor in interest, the power company has the right to erect, construct, repair, maintain, replace, relocate, inspect, operate, and remove upon, over, under and across the right-of-way, poles, towers, crossarms, guys, foundations, anchors, braces, ducts, manholes, and other structures, wires, cables and other conductors, and other fixtures and appurtenances useful for conducting electricity and/or for providing and maintaining electric and/or communication service, and monuments and

signs to locate the right-of-way. The court found, as well, that Legere had conceded that, due to this provision, the proposed construction of the 345 kilovolt line would not overburden the grant of easement. Finally, the court found that the international standard limit for electric and magnetic field (EMF) exposure had been 833 units of milligauss but had recently been changed to 2000 milligauss and that a conservative estimate for EMF exposure in the right-of-way at the Legere property is 200 milligauss.

The court appears to have determined that Legere was not classically aggrieved on two bases: (1) the power company already had an easement over Legere's real property that would not be overburdened by the construction of the proposed 345 kV line, and (2) Legere did not prove that the proposed 345 kilovolt transmission lines posed a health risk to him or threatened his use and enjoyment of his property.

Whether or not increasing the allowable voltage on the transmission lines traversing the Legere property would overburden the easement granted to the power company does not answer the question of whether the salutary purposes of PUESA would be met by granting the power company's application. In other words, notwithstanding the existence of rights created by the easement, Legere retains a legal interest in the protection of his property and his well-being from unreasonably high exposure to radiation, and the state retains the responsibility to maintain the balance that PUESA was intended to achieve.

As to the second basis for the court's determination that Legere is not classically aggrieved, it appears that the trial court made a decision on the merits rather than on whether Legere made a sufficient demonstration of potential harm to allow him to be heard on the merits. In rejecting Legere's claim, the court commented: "Even

if the court were to evaluate Legere's proof of harm, it consists only of the alleged danger arising from the EMF exposure that he would receive while in or adjacent to the right-of-way. The opinion of the [siting] council, quoted above, as well as the evidence at the March 1 and March 8 [2011] hearings, show that Legere would be exposed to no more than 300 [milligauss] in the right-of-way. This level of exposure does not exceed any applicable safety standards examined by this court or the [siting] council. Moreover, Legere has not submitted any evidence tending to show that such levels would cause injury to himself or others. Legere has therefore not met his burden of proving aggrievement . . . ." While I understand the general jurisprudence that, in order to show classical aggrievement, one must provide a basis greater than speculation, a would-be appellant need not, however, prove his case on the merits in order to have standing to contest an agency decision. Contrary to the trial court's conclusion, I believe Legere has demonstrated "a possibility, as distinguished from a certainty," that his legally protected interest in the use and enjoyment of his property and his personal well-being have been adversely affected by the decision of the siting council. (Internal quotation marks omitted.) *New England Cable Television Assn., Inc.* v. *Dept. of Public Utility Control,* supra, 247 Conn. 103. Accordingly, because I would remand this matter to the trial court for a hearing on the merits of Legere's appeal from the decision of the siting council, I respectfully dissent.